**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

MATTHEW ROMAN, M.D.       :
                              :

          Plaintiff,         :
                              :

        v.                   :    NO.
                              :

ACTING ATTORNEY GENERAL  :
MATTHEW WHITAKER, and his    :
successors                      :
                              :

        and                :
                              :

THOMAS E. BRANDON, DEPUTY  :
DIRECTOR AND HEAD OF THE   :
U.S. BUREAU OF ALCOHOL,     :
TOBACCO, FIREARMS AND      :
EXPLOSIVES, and his successors  :
                              :

        and                :
                              :

CHRISTOPHER WRAY, DIRECTOR  :
OF THE FEDERAL BUREAU OF   :
INVESTIGATION ("FBI"), and his  :
successors                      :
                              :

        and                :
                              :

THE UNITED STATES OF      :
AMERICA                      :
                              :

          Defendants.      :

## **INTRODUCTION**

1.  This is an action, in law and equity, to uphold the constitutional right to keep and bear arms, including the right to acquire such arms, which extends to all law-abiding citizens.

2.   The Second Amendment "guarantee[s] the individual right to possess" firearms and "elevates above all other interests the right of law-abiding, responsible citizens to use arms in the defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2797, 2821 (2008).

3.   The Second Amendment explicitly states that it is a "right of the people." U.S. Const. amend. II.

4.   In its opinion in *District of Columbia v. Heller*, the Supreme Court of the United States carefully noted that, when the Constitution refers to "the people," "the term unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 644. The Court therefore began its analysis, "with a strong presumption that the Second Amendment right is exercised individually and *belongs to all Americans*." *Id*. at 581 (emphasis added).

5.   Contrary to the well-established right of law-abiding citizens to keep and bear arms, Defendants have prohibited a certain class of law-abiding citizens from exercising this right. Defendants have enacted, maintained, or otherwise perpetuated laws, regulations, and policies which have the specific intent of denying the Plaintiff, and those similarly situated, the individual right to keep and bear arms, as guaranteed under the Second Amendment. Specifically, these laws, regulations, and policies intentionally deny this right to those who have registered to use medical cannabis pursuant to state-sanctioned medical cannabis programs.

6.   Defendants have intentionally denied those who have registered to use medical cannabis pursuant to state law the right to lawfully purchase firearms without providing any due process prior to depriving this class of individuals of their constitutional right.

7.  Based on its plain meaning, as well as Defendants' interpretation of the text, Subsections (d)(3) and (g)(3) of 18 U.S.C. § 922—the federal statute governing the right to keep and bear arms—unconstitutionally prohibit law-abiding citizens who have enrolled in state medical cannabis programs from purchasing a firearm, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 628-29.

8.  This strict, rigid, blanket prohibition violates the fundamental constitutional rights of tens of thousands of non-violent, law-abiding citizens, and is thus violates the Second and Fifth Amendments of the Constitution.

<u>**THE PARTIES**</u>

9.  Plaintiff, Matthew Roman, MD ("Dr. Roman" or "Plaintiff"), is an individual and natural citizen of the United States and the Commonwealth of Pennsylvania.  Dr. Roman has attempted to acquire and intends to acquire a Smith & Wesson Model 638 Revolver for self-defense within his home.  The unconstitutional laws and policies described in this Complaint prohibit Dr. Roman from acquiring a firearm, however, due to his status as a patient in Pennsylvania's Medical Cannabis Program.

10. Defendant, ACTING ATTORNEY GENERAL MATTHEW WHITAKER ("Attorney General" or "Mr. Whitaker"), and his successors, are sued in their official capacity as the Acting Attorney General of the United States.  As Acting Attorney General, Defendant Whitaker is responsible for executing and administering the laws, regulations, customs, practices, and policies of the United States.  He is presently enforcing the laws, regulations, customs, practices, and policies complained of in this action.  As Acting Attorney General, Defendant Whitaker is ultimately responsible for supervising the functions and actions of the United States Department of Justice,

including the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Federal

Bureau of Investigation, which are arms of the Department of Justice.

11. Defendant, THOMAS E. BRANDON, and his successors, are the DEPUTY

DIRECTOR AND HEAD OF THE U.S. BUREAU OF ALCOHOL, TOBACCO,

FIREARMS AND EXPLOSIVES ("ATF").  The ATF is a branch of the Department of

Justice and is responsible for regulating the licensing, possession, sale, and transportation

of firearms and ammunition in interstate commerce. The ATF is currently authorized to,

and currently is, implementing and enforcing the federal laws complained of in this

action.  In his capacity as Deputy Director and Head of the ATF, Defendant Thomas E.

Brandon is presently enforcing the laws, regulations, and policies described in this action.

12. Defendant, CHRISTOPHER WRAY, and his successors, are the current

DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION ("FBI").  The FBI is

the principal law enforcement agency of the Federal Government, operating under the

jurisdiction of the Department of Justice.  The FBI is responsible for the maintenance,

administration, and operation of the National Instant Criminal Background Check System

(NICS).  NICS is used by Federal Firearms Licensees (FFLs) to instantly determine

whether a prospective buyer is eligible to buy firearms. Before ringing up the sale,

cashiers call in a check to the FBI or to other designated agencies to ensure that each

customer does not have a criminal record or is not otherwise ineligible to make a

purchase. By its operation of the NICS program, in conjunction with the

unconstitutionality of the laws complained of in this action, the FBI is currently

authorized to, and currently is, implementing and enforcing the federal laws complained

of in this action.  In his capacity as Director and Head of the FBI, Defendant Christopher Wray is presently enforcing the laws, regulations, and policies described in this action.

13. Defendant, THE UNITED STATES OF AMERICA, is a proper defendant in this action pursuant to 5 U.S.C. § 702.

## JURISDICTION AND VENUE

14. This action concerns subject matter that is within the original and exclusive jurisdiction of the district courts of the United States of America, in that this action arises under the Constitution and laws of the United States, and therefore jurisdiction is founded on 28 U.S.C. § 1331.

15. This action seeks relief pursuant to 28 U.S.C. §§ 2201-02, 2412.

16. There is no administrative remedy available to Plaintiff.[1]

17. Pursuant to 28 U.S.C. § 1343, this action seeks to enforce a right for which the United States District Courts have original jurisdiction to protect.

18. Defendants are subject to actions for relief in law and equity, such as this suit, pursuant to 5 U.S.C. § 702.

19. The Court has the authority to award costs and attorney's fees pursuant to 28 U.S.C. §§ 2412, 1920 and 18 U.S.C. § 925(a).

---

[1] Pursuant 18 U.S.C. § 925(c), an individual prohibited from acquiring a firearm may apply to the Attorney General for relief from the prohibition, which the Attorney General may grant if "the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." The ATF has promulgated a rule detailing the manner that a review under 18 U.S.C. § 925(c) may be sought. *See* 27 C.F.R. § 478.144. However, notwithstanding the provisions of 18 U.S.C. § 925(c) and 27 C.F.R.§ 478.144, which purport to provide a means to request relief for an individual prohibited from acquiring a firearm, since 1993, the United States Congress has specifically denied any funding "to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. § 925(c)." The Consolidated Appropriations Act, 2018, Pub. L. No. 115–141, 132 Stat. 348. *See also* https://fas.org/sgp/crs/misc/R44686.pdf at 24.  Due to the above lack of funding, ATF does not in fact provide any review under 18 U.S.C. § 925(c) to provide relief from a federal prohibition on purchasing, possessing or utilizing a firearm. Because Defendant ATF does not provide a review for relief from a federal prohibition on acquiring or possessing a firearm, Plaintiff Roman cannot avail himself of any federal procedure to vindicate his Second Amendment rights on the basis that he does not present a threat to himself or others.

20. Venue in the Eastern District of Pennsylvania is proper pursuant to 28 U.S.C. § 1931(e).

### STATEMENT OF FACTS

**I.    PLAINTIFF, MATTHEW A. ROMAN, MD, WAS DENIED HIS SECOND AMENDMENT RIGHT TO OWN A FIREARM**

21. Plaintiff, Dr. Roman, was born on January 11, 1985.

22. Dr. Roman is a medical doctor who is certified by the Commonwealth of Pennsylvania to recommend medical cannabis to qualifying patients.

23. Dr. Roman is also a medical cannabis cardholder and consumer, and is properly registered as such with the Commonwealth of Pennsylvania.

24. Dr. Roman was born and raised in the greater Philadelphia area. He grew up in a his mother and father's bed and breakfast, which catered to brain-injured children attending The Institutes for the Achievement of Human Potential.

25. Dr. Roman is a strong proponent of legalizing medical cannabis, having personally reviewed the relevant medical literature, and having weighed the value of individual studies' results against one another. He has blogged about the potential benefits of cannabis for years, and has been a guest blogger on the Science-Based Medicine Blog, writing the first ever analysis of the Patient Affordable Care Act's effect on Complementary and alternative medicine (CAM).

26. Dr. Roman believes that overprescribing by today's physicians has created an epidemic of narcotic dependence and drug diversion, and that Medical Cannabis is a valid solution to this nationwide problem.

27. In fact, Dr. Roman has found that opiate use among his patients has reduced by about fifty percent (50%), as a result of their switching to Medical Cannabis.

28. In October 2017, Dr. Roman obtained a valid, state-sanctioned medical cannabis patient card in the State of Delaware, and in or about March 2018 he obtained a similar permit from the Commonwealth of Pennsylvania's Department of Health.

29. Pursuant to his status as a state-sanctioned medical cannabis patient, Dr. Roman has used, and continues to use medical cannabis for the purposes of treating his post-traumatic stress disorder.

30. Dr. Roman is a law-abiding citizen, who had no propensity for violence before his use of medical cannabis, and who continues to have no propensity for violence after using medical cannabis to treat his illness.

31. On April 28, 2018, Dr. Roman went to a local gun store for the purpose of purchasing a Smith & Wesson Model 638 Revolver.

32. Dr. Roman was driven by his friend, Mr. Bernard Wagenseller, who picked him up from his home at 4:00 p.m.

33. At 4:06 p.m., Dr. Roman and Mr. Wagenseller arrived at the local gun store, Firing Lane, Inc., located at 1532 S. Front St., Philadelphia, PA 19147.  Inside the store, there were some customers and a few staff members behind the counter helping others.

34. At 4:11 p.m., one of the staff members assisted Dr. Roman, who requested to purchase a Smith & Wesson Model 638 Revolver.

35. The staff member proceeded to ask Dr. Roman a series of questions, one of which inquired as to whether Dr. Roman possessed a medical cannabis card.

36. Dr. Roman truthfully answered that he did have a medical cannabis card, and the staff member responded that it was not legal under federal law to have a medical cannabis card and purchase a weapon.

37. At this point, a second staff member approached the two men and read aloud Question 11(e) on ATF Form 4473 (i.e. the question about being a marijuana user) and its accompanying disclaimer, explaining that use by cannabis card holders is still considered illegal.

38. The staff member asked Dr. Roman if he would answer "yes" to Question 11(e), to which Dr. Roman replied in the affirmative. Dr. Roman was then told he could not purchase a weapon if such were the case.

39. Redirecting his attention to the first staff member, Dr. Roman asked whether, if he returned his medical cannabis card, he could then purchase the gun, to which the staff member replied, "that would be fine."

40. At 4:20 p.m. Dr. Roman thanked the staff member for his time and exited the building with Mr. Wagenseller.

41. Medical cannabis dispensaries in the Commonwealth of Pennsylvania offer a wide variety of medical cannabis products including those with very little tetrahydrocannabinol, the main psychoactive component of the cannabis plant.

42. Medical Cannabis dispensaries in the Commonwealth of Pennsylvania offer Medical Cannabis products with a cannabidiol ("CBD") (non-psychoactive) to tetrahydrocannabinol ("THC") ratio as low as ten parts CBD to one part THC (i.e. 10:1).

43. Dr. Roman purchased and used Medical Cannabis with the above-referenced 10:1 ratio and felt no psychoactive, nor any otherwise motor-function-inhibiting effects.

## II.   HISTORY OF SAFE CULTIVATION AND CONSUMPTION OF CANNABIS

### a.   Cannabis in Colonial America and its Importance to Our Founding Fathers

44.  By the seventeenth century, Britain began colonizing much of the "New World," and the Americas in particular; a venture, the success of which, was built in part by the cultivation and use of hemp.[2]

45.  The early colonists grew hemp for the production of rope, sails, and clothing.[3]

46.  In fact, hemp was held to be so valuable that farmers were permitted to pay a portion of their taxes with the plant in certain colonies, such as Pennsylvania in 1706.[4]

47.  Among those who cultivated and or used hemp for both personal and commercial purposes were the Founding Fathers, including George Washington, Thomas Jefferson, and Benjamin Franklin.[5]

48.  Thomas Jefferson received the first United States patent for his invention of a machine that would begin the fiber extraction process for cultivating hemp.[6]  Similarly, Benjamin Franklin, earned a substantial portion of his wealth cultivating hemp to use as raw material for his leading paper production company.[7]

49.  Until 1883, 75-90% of all paper in the world was made with hemp fiber;[8] in fact, early drafts of the Declaration of Independence and the United States Constitution were written on hemp-based paper.[9]

### b.  Early Medicinal Use of Cannabis in the Americas

---

[2] Robert Deitch, *Hemp – American History Revisited: The Plant with a Divided History*, 12 (2003). "…Britain encouraged its people to colonize America – and they did that primarily because Britain's Domestic hemp-based industry, the lifeblood of the economy, desperately needed a stable, reliable, and relatively cheap source of raw hemp." *Id.* at 13 (emphasis added).

[3] *Id.* at 14.

[4] *Id.* at 19.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at 35.

50. Colonial America's use of the cannabis plant was not merely restricted to manufacturing or industrial purposes, as "colonial Americans were aware of the medicinal properties of Cannabis.  It was one of the few medicines they had, and they used it as commonly as we use Aspirin today."[10]

51. Some of the Founding Fathers, such as Thomas Jefferson, smoked Cannabis (also known as "hemp" or "sweet hemp" at the time) for both medicinal and recreational purposes.[11]  Thomas Jefferson mentioned in his diary that he smoked hemp as a remedy for his migraines.[12]

52. Cannabis was officially introduced into Western Medicine in the 1830s by William O'Shaughnessy, a doctor for the British East India Company, who referred to the plant as an "anti-convulsive remedy of the highest value," that was highly effective in treating rheumatoid arthritis, spasticity, and pain in general.[13]

53. By 1850, the *United States Pharmacopoeia* listed Cannabis as a treatment for neuralgia, typhus, cholera, convulsive-inducing conditions, alcoholism, and opiate addiction, among others.[14]  Ten years later, the Ohio State Medical Society's Committee on Cannabis Indica found the plant to be highly effective for more common ailments such as stomach cramps, coughs, venereal disease, post-partum depression, epilepsy, and asthma.[15]

c.  **History of Cannabis Illegality in the United States**

---

[10] *Id.* at 25.
[11] *Id.* at 25-26.
[12] *Id.*
[13] Steve DeAngelo, *The Cannabis Manifesto: A New Paradigm for Wellness*, at 48 (2015).
[14] Martin Booth, *Cannabis: A History*, at 113-114 (2003).
[15] *Id.*

54. Prior to 1906, cannabis, like opiates and cocaine, was freely available at drug stores in liquid form and as hashish, a refined product. Cannabis was also a common ingredient in turn-of-the-century patent medicines, including over-the-counter concoctions brewed to proprietary formulas.[16]

55. The practice of smoking cannabis leaf in cigarettes or pipes was largely unknown in the United States until it was introduced by Mexican immigrants during the first few decades of the twentieth century. That introduction, in turn, generated a reaction in the United States, tinged with anti-Mexican xenophobia.[17]

56. The first attempt at Federal regulation of cannabis came in 1906, with the passage of the Pure Food and Drug Act. The Act included cannabis among the various substances which patent medicine companies were required to list on their labels in order that worried customers could avoid it.[18] The Act did not make cannabis illegal.[19]

57. After the Mexican Revolution of 1910, Mexican immigrants flooded into the United States, introducing to American culture the recreational use of cannabis, or as they called it, "Marijuana."[20] The drug became associated with the fear and prejudice about these Spanish-speaking newcomers.[21] Anti-drug campaigners warned against the

---

[16] Stephen Siff, Origins: Current Events in Historical perspective, Vol. 7, Issue 8. *The Illegalization of Marijuana: A Brief History* (May 2014).
http://origins.osu.edu/article/illegalization-marijuana-brief-history.
[17] *Id.*
[18] *Id.*
[19] *See id.*; *see also Marijuana Timeline*, PBS.
https://www.pbs.org/wgbh/pages/frontline/shows/dope/etc/cron.html
[20] *Id.*
[21] *Id.*

encroaching "Marijuana Menace," and terrible crimes were attributed to marijuana and the Mexicans who used it.[22]

58. Due to the aforementioned xenophobia and prejudice, individual states began to outlaw cannabis, despite its legal status under federal law.[23]

59. Amid the rise of anti-immigrant sentiment fueled by the Great Depression, public officials from the Southwest and from Louisiana petitioned the Treasury Department to outlaw cannabis.[24]

60. Harry J. Anslinger, the commissioner of the Federal Bureau of Narcotics found his agency in jeopardy due to federal tax revenues dwindling under the economic crisis that was the Great Depression.[25]

61. Congress began to slash spending and there was discussion about eliminating the Federal Bureau of Narcotics; needless to say, Mr. Anslinger needed a compelling reason to justify his agency's existence.[26]

62. Mr. Anslinger at first doubted the seriousness of the problem and the need for Federal legislation, but soon he pursued the goal of a nationwide cannabis prohibition with intense enthusiasm.[27]

---

[22] PBS, *supra* Note 18; "The prejudices and fears that greeted these peasant immigrants also extended to their traditional means of intoxication: smoking marijuana. Police officers in Texas claimed that marijuana incited violent crimes, aroused a 'lust for blood,' and gave its users 'superhuman strength.' Rumors spread that Mexicans were distributing this 'killer weed' to unsuspecting American schoolchildren. Sailors and West Indian immigrants brought the practice of smoking marijuana to port cities along the Gulf of Mexico. In New Orleans newspaper articles associated the drug with African-Americans, jazz musicians, prostitutes, and underworld whites. 'The Marijuana Menace,' as sketched by anti-drug campaigners, was personified by inferior races and social deviants." Eric Schlosser, *Reefer Madness*, The Atlantic (Aug. 1994). https://www.theatlantic.com/magazine/archive/1994/08/reefer-madness/303476/.
[23] "In 1914 El Paso, Texas, enacted perhaps the first U.S. ordinance banning the sale or possession of marijuana; by 1931 twenty-nine states had outlawed marijuana, usually with little fanfare or debate." Eric Schlosser, *Reefer Madness*, The Atlantic (Aug. 1994). https://www.theatlantic.com/magazine/archive/1994/08/reefer-madness/303476/.
[24] *Id.*
[25] Bruce Barcott, *Weed the People: The Future of Legal Marijuana in America*, at 21 (2015).
[26] *Id.*

63. Mr. Anslinger's tirade against cannabis was littered with racist and xenophobic claims, and he has been quoted as saying the following:

    a.  "Reefer makes darkies think they're as good as white men."

    b.  "There are 100,000 total marijuana smokers in the US, and most are Negroes, Hispanics, Filipinos and entertainers. Their Satanic music, jazz and swing, result from marijuana usage. This marijuana causes white women to seek sexual relations with Negroes, entertainers and any others."

    c.  "The primary reason to outlaw marijuana is its effect on the degenerate races."[28]

64. Cannabis propaganda, its underlying racism and xenophobia, and rising state prohibition led to Congress passing the Marihuana Tax Act of 1937, effectively criminalizing cannabis by restricting possession of the drug to individuals who paid an excise tax for certain authorized medical and industrial uses.[29]

65. Under the act, "anyone using the hemp plant for certain defined industrial or medical purposes was required to register and pay a tax of a dollar an ounce. A person using marihuana for any other purpose had to pay a tax of $100 an ounce on unregistered

---

[27] Schlosser, *supra* Note 22 ("In public appearances and radio broadcasts Anslinger asserted that the use of this "evil weed" led to killings, sex crimes, and insanity. He wrote sensational magazine articles with titles like "Marijuana: Assassin of Youth."); Barcott, *supra* Note 24 ("Anslinger traveled the county offering demon-drug sermons to police agencies, civic clubs, religious groups, women's organizations and editorial boards…His campaign became a self perpetuating machine…[and] inspired a whole genre of pulp fiction and exploitation films, including the notorious *Reefer Madness*.").

[28] Cannabis.info, *15 most ridiculous quotes about 'marihuana' by Harry J. Anslinger* (Apr. 19, 2017). https://www.cannabis.info/en/blog/harry-j-anslinger-15-ridiculous-quotes-about-marihuana.

[29] PBS *supra* Note 18.

transactions. Those who failed to comply were subject to large fines or prison for tax evasion... its purpose was to discourage recreational marihuana smoking."[30]

66. During the 1937 hearings on the Act, W.C. Woodward, a representative of the American Medical Association, stood before the House Ways and Means Committee and pointed out that Congress had virtually no empirical medical proof that Cannabis was addictive, prominently used by adolescents, *or causally connected to violent behavior*, and that the evidence upon which they based the need for this legislation came in the form of newspaper articles, and not from medical sources.[31]

67. In support of his argument that Medical Cannabis should have less restriction, he said:

    a. "There is nothing in the medicinal use of Cannabis that has any relation to Cannabis addiction. I use the word 'Cannabis' in preference to the word 'marihuana', because Cannabis is the correct term for describing the plant and its products. The term 'marihuana' is a mongrel word that has crept into this country over the Mexican border and has no general meaning, except as it relates to the use of Cannabis preparations for smoking... To say, however, as has been proposed here, that the use of the drug should be prevented by a prohibitive tax, loses sight of the fact that future investigation may show that there are substantial medical uses for Cannabis."[32]

---

[30] *See* Lester Grinspoon, M.D. & James B. Bakalar, *Marihuana, the Forbidden Medicine*, at 8 (1997).
[31] *Id.* (emphasis added).
[32] ProCon.org., *William C. Woodward, MD Biography* (Dec. 22, 2011), available at: https://medicalmarijuana.procon.org/view.source.php?sourceID=011280.

68. Despite the existence of valid studies indicating the virtual harmlessness of cannabis, the lack of information travel in the 1930s, coupled with a strong, propaganda-based campaign against cannabis led to the ultimate passing of the Marihuana Tax Act of 1937.[33]

69. The Act's supposed intention was aimed at eliminating recreational use of cannabis; however, the Federal Bureau of Narcotics began making it increasingly difficult to obtain cannabis for scientific studies, and when studies were possible, the Bureau would only accept as legitimate those studies painting a negative picture of cannabis.[34]

70. Shortly after passage of the Act, New York's Mayor La Guardia formed a team of physicians and scholars to study the medical, social, and psychological consequences of cannabis use in New York City.[35]  The report concluded that there was *no proof that cannabis caused violent, aggressive behavior.*[36]

71. The Journal of the American Medical Association published an editorial validating the La Guardia study as "a careful study," even noting a few of cannabis's

---

[33] Barcott, *supra* Note 24, at 23 ("In 1893 the British government commissioned a report on cannabis use in India.  The Indian Hemp Drugs Commission spent years studying the issue before publishing an eight-volume report that found 'the moderate use of hemp drugs is practically attended by no evil results at all.' In 1925 the U.S Army investigated cannabis use by soldiers in the Panama Canal Zone…The committee found no evidence that marijuana "has any appreciably deleterious influence on the individuals using it…The Indian Hemp Drugs Commission Study and the Canal Zone report were available at only a handful of research libraries.  A few government officials knew of their existence but had every reason to keep quiet.")

[34] *See* Gregg A. Bilz, *The Medical Use of Marijuana: The Politics of Medicine*, 13 Hamline J. Pub. L. & Pol'y 117, 120-21 (Spring, 1992).

[35] *Id.*

[36] *Id. (emphasis added)*; "The practice of smoking marihuana does not lead to addiction in the medical sense of the word… The use of marihuana does not lead to morphine or heroin or cocaine addiction and no effort is made to create a market for these narcotics by stimulating the practice of marihuana smoking… Marihuana is *not the determining factor in the commission of major crimes*... The publicity concerning the catastrophic effects of marihuana smoking in New York City is unfounded."  ProCon.org, *History of Marijuana as Medicine – 2900 BC to Present* (last updated Jan. 30, 2017) *(emphasis added)*. https://medicalmarijuana.procon.org/view.timeline.php?timelineID=000026#1900-1949.

potential medical uses.[37] Mr. Anslinger quickly responded, writing a letter to the AMA Journal severely criticizing the La Guardia study.[38]

72. At that point, the American Medical Association "made an extraordinary about-face and joined the Federal Bureau of Narcotics in the denunciation of the La Guardia Report," thereafter publishing an editorial advising policymakers to disregard such an "unscientific" study and to "continue to regard marihuana as a menace wherever it is purveyed."[39]

73. Mr. Anslinger's racially and ethnically motivated crusade against cannabis, as opposed to factual evidence of its harm, led to the Federal Government taking a fervent anti-Cannabis policy approach well into the 1960s.[40]

74. The 1960s seemed to bring a glimmer of hope as to federal treatment of cannabis. The political and cultural climate reflected a more lenient attitude towards cannabis, in part because use of the drug became widespread in the white upper middle class.[41] Reports commissioned by Presidents Kennedy and Johnson found that marijuana use *did not induce violence* nor lead to use of heavier drugs.[42]

75. By 1970, however, the Nixon administration successfully revived prior negative attitudes towards cannabis and urged congress to enact legislation that would classify drugs under separate schedules according to their medicinal value, dangerousness, and addictive properties.  Congress responded by passing the Controlled Substances Act in

---

[37] *Id.*
[38] *Id.*
[39] *Id.* at 121-22.
[40] *See* Grinspoon & Bakalar, *supra* Note 29, at 13.
[41] PBS, *supra* Note 18.
[42] *Id. (emphasis added).*

16

October of 1970, placing cannabis in Schedule I, thereby submitting it to the most restrictive controls under the Act.[43]

76. Despite "almost total agreement among competent scientists and physicians that marihuana is not a narcotic drug like heroin or morphine...[and an acknowledgment that] equat[ing] its risks... with the risks inherent in the use of hard narcotics is neither medically nor legally defensible,"[44] Congress nonetheless included cannabis in the same Schedule as opiates and opiate derivatives.[45]

77. The Department of Health, Education, and Welfare recommended that cannabis remain under Schedule I only "until the completion of certain studies now underway to resolve this issue."[46]

78. Thereafter President Nixon appointed Raymond Shafer to Chair the National Commission on Marijuana and Drug Abuse, which would later come to be known as the "Shafer Commission."[47]   Under Shafer, the Commission conducted "more than 50 projects, ranging from a study of the effects of marijuana on man to a field survey of enforcement of the marijuana laws in six metropolitan jurisdictions."[48]

79. The Commission's ultimate findings included the following:

---

[43] 21 U.S.C.S. § 812 (LexisNexis).
[44] *Drug Abuse Control Amendment – 1970: Hearings Before the Subcomm. On Public Health and Welfare*, 91 Cong. 179 (1970) (Statement of Dr. Stanley F. Yolles).
[45] *Supra* Note 42.
[46] H.R. Rep. 91-1444 at 2111.
[47] ProCon.org, *supra* Note 35.
[48] National Commission on Marihuana and Drug Abuse, *Marihuana: A Signal of Misunderstanding; First Report*, Washington, D.C., U.S. Government Printing Office, 1972.
http://www.beyondthc.com/wp-content/uploads/2012/06/Nixon-Shafer.pdf.

a. "The weight of the evidence is that marihuana *does not cause violent or aggressive behavior; if anything marihuana serves to inhibit the expression of such behavior.*"[49]

b. "Neither the marihuana user nor the drug itself can be said to constitute a danger to public safety."[50]

80. President Nixon rejected the Shafer Commission findings as they were inconsistent with his Administration's cannabis related agenda, which was motivated by racism and suppressing the civil rights of certain classes of citizens.

81. John Ehrlichman, President Nixon's former Domestic Policy Chief is quoted as saying the following:

a. "You want to know what this was really all about [?]…The Nixon campaign in 1968, and the Nixon White House after that, had two enemies: the antiwar left and black people…We knew we couldn't make it illegal to be either against the war or black, but by getting the public to associate the hippies with marijuana and blacks with heroin, and then criminalizing both heavily, we could disrupt those communities. We could arrest their leaders, raid their homes, break up their meetings, and vilify them night after night on the evening news. Did we know we were lying about the drugs? Of course we did."[51]

82. President Nixon had his mind made up about the issue of cannabis's legal status well before the Shafer Commission report was even issued.  In September 1971, Mr.

---

[49] *Id.* (emphasis added).

[50] *Id.*

[51] Edelman, Adam, *Nixon Aide: "War on Drugs" was tool to target "black people"* (March 23, 2016). http://www.nydailynews.com/news/politics/nixon-aide-war-drugs-tool-target-black-people-article-1.2573832.

Shafer contacted President Nixon to discuss his concern that the Commission was "put together by a President to merely toe the party line."[52]

83.  President Nixon made it clear that he did not care about the ultimate conclusions drawn by the Commission, and urged Mr. Shafer to ignore the obvious differences between cannabis and other, more dangerous drugs.[53]

84.  To this day, despite strong evidence supporting the fact that cannabis's prohibition is rooted in racism and xenophobia, the substance remains a Schedule I narcotic under the Controlled Substances Act.[54]

### d.  Modern Medicinal Use of Cannabis in the United States of America

85.  Beginning in 1976, the United States began subsidizing a program, known as the Investigational New Drug Program ("IND Program"), whereby certain individuals were provided with medical cannabis.[55]  The very first of these individuals was Robert Randall who was arrested for growing cannabis on his back deck and had to prove that this medicine was essential in to prevent his progressive loss of vision from glaucoma.[56]  Mr. Randall ultimately won his case and subsequently the Federal Government allowed him access to the federal cannabis supply through the IND Program.[57]

---

[52] Tape Recording, September 9, 1971 (Oval Office Conversation No. 568-4). http://www.csdp.org/research/nixonpot.txt.
[53] *Id.* ("I think there's a need to come out with a report that is totally, uh, uh, oblivious to some obvious, uh, differences between marijuana and other drugs, other dangerous drugs, there are differences").
[54] *Supra* Note 42.
[55] MedicalCannabis.com, *Federal IND Patients*.  http://www.medicalcannabis.com/patients-care-givers/federal-ind-patients/.
[56] *Id.*
[57] *Id.*

86. At its peak, there were about 15 patients receiving medical cannabis from the Federal Government, via the IND Program.[58] The Program remains in existence to this day.[59]

87. Upon information and belief, none of the patients who have participated in the IND Program have suffered any serious side effects, nor any harm from their cannabis treatment.

88. The Missoula Chronic Clinical Cannabis Use Study ("MCCCUS") investigated the therapeutic benefits and adverse effects of prolonged use of "medical marijuana" in a cohort of seriously ill patients receiving federally sanctioned cannabis via the IND Program.[60]

89. The MCCCUS yielded the following findings[61]:

    a. Cannabis smoking, even of a crude, low-grade product, provides effective symptomatic relief of pain, muscle spasms, and intraocular pressure elevations in selected patients failing other modes of treatment.

    b. These clinical cannabis patients are able to reduce or eliminate other prescription medicines and their accompanying side effects.

    c. Clinical cannabis provides an improved quality of life in these patients.

    d. The side effect profile of NIDA cannabis in chronic usage suggests some mild pulmonary risk.

---

[58] *Id.*

[59] U.S. Food and Drug Administration, *Investigational New Drug (IND) Application.* https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approvalapplications/investigationalnewdrugindapplication/default.htm

[60] Ethan Russo, Mary Lynn Mathre, Al Byrne, Robert Velin, Paul J. Bach, Juan Sanchez-Ramos, Kristin A. Kirlin, *Chronic Cannabis Use in the Compassionate Investigational New Drug Program: An Examination of Benefits and Adverse Effects of Legal Clinical Cannabis*, at 3 (2002). http://www.cannabis-med.org/iacm/data/pdf/2002-01-1.pdf

[61] *Id.* at 51-52.

    e.   No malignant deterioration has been observed.

    f.   No consistent or attributable neuropsychological or neurological deterioration has been observed.

    g.   No endocrine, hematological or immunological sequelae have been observed.

    h.   Improvements in a clinical cannabis program would include a ready and consistent supply of sterilized, potent, organically grown unfertilized female flowering top material, thoroughly cleaned of extraneous inert fibrous matter.

    i.   It is the authors' opinion that the Compassionate IND program should be reopened and extended to other patients in need of clinical cannabis.

    j.   Failing that, local, state and Federal laws might be amended to provide regulated and monitored clinical cannabis to suitable candidates.

90. Despite the existence of scholarly support for the Federal IND Program and its expansion, the Federal Government has not sought to establish a more robust legal, medical cannabis program.

91. In 1996, California became the first state to legalize cannabis for medicinal purposes.[62]

92. Since then, 28 more states have implemented state sanctioned medical cannabis programs, bringing the total to 29 states.[63]

93. It did not take long, however, for the Federal Government to realize cannabis's true medical potential.

---

[62] National Conference of State Legislatures, *State Medical Marijuana Laws* (Mar. 28, 2018). http://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx.
[63] *Id.*

94. In or about 1999, shortly after California passed its medical cannabis legislation, the United States filed a patent application titled: "Cannabinoids As Anti-Oxidants And Neuroprotectants."[64]

95. The Application abstract provides as follows:

    a. "Cannabinoids have been found to have antioxidant properties…This new found property makes cannabinoids useful in the treatment and prophylaxis of wide variety of oxidation associated diseases, such as ischemic, age-related, inflammatory and autoimmune diseases. The cannabinoids are found to have particular application as neuroprotectants, for example in limiting neurological damage following ischemic insults, such as stroke and trauma, or in the treatment of neurodegenerative diseases, such as Alzheimer's disease, Parkinson's disease and HIV dementia."[65]

96. In November 2017, in the midst of a national opioid epidemic, a Colorado study found that "legalization of cannabis in Colorado was associated with short-term reductions in opioid-related deaths."[66]

97. Even more recently, members of the Federal Government have spoken out in support of legalizing cannabis and its related products.

---

[64] United States Patent 6,630,507.
http://patft.uspto.gov/netacgi/nphParser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=6630507.PN.&OS=PN/6630507&RS=PN/6630507
[65] Id.
[66] Livingston MD, Barnett TE, Delcher C, Wagenaar AC, *Recreational Cannabis Legalization and Opioid-Related Deaths in Colorado, 2000-2015* (Nov. 2017) (Colorado's legalization of recreational cannabis sales and use resulted in a 0.7 deaths per month (b = -0.68; 95% confidence interval = -1.34, -0.03) reduction in opioid-related deaths. This reduction represents a reversal of the upward trend in opioid-related deaths in Colorado).
https://www.ncbi.nlm.nih.gov/pubmed/29019782.

98. On April 12, 2018 Senate Majority Leader Mitch McConnell (R-KY), announced that he would be introducing a bill, along with the support of Senator Ron Wyden (D-OR) and Senator Jeff Merkley (D-OR), to legalize hemp, calling the bill "legislation that will modernize federal law in this area and empower American farmers to explore this promising new market."[67]

99. The following day, President Donald Trump gave his assurances to Senator Cory Gardner (P-CO) that he would back legislation that "protects states' rights" on legalized cannabis.[68]

100.     One week thereafter, Senate Minority Leader Chuck Schumer (D-NY) announced his plan to introduce legislation decriminalizing recreational cannabis at the federal level, saying:

   a.   "My thinking -- as well as the general population's views -- on the issue
        has evolved, and so I believe there's no better time than the present to get
        this done. It's simply the right thing to do... [I have] seen too many
        people's lives ruined because they had small amounts of marijuana and
        served time in jail much too long... A staggering number of American
        citizens, a disproportionate number of whom are African American and
        Latino, continue to be arrested every day for something that most
        Americans agree should not be a crime.  Meanwhile, those who are
        entering into the marijuana market in states that have legalized are set to

---

[67] Lesley Clark, *Mitch McConnell — yes, that Mitch McConnell — moves to legalize hemp across the country* (Apr. 18, 2018).
http://www.mcclatchydc.com/news/politics-government/congress/article209273324.html.
[68] Elizabeth Zwirz, *Trump now backs marijuana 'states rights' bill, senator says* (Apr. 14, 2018).
http://www.foxnews.com/politics/2018/04/14/trump-now-backs-marijuana-states-rights-bill-senator-says.html.

make a fortune. This is not only misguided, but it undermines the basic principles of fairness and equal opportunity that are foundational to the American way of life."[69]

**e. Lack of Causational Evidence to Support the Theory that Medical Cannabis Use Leads to Acts of Violence**

101.     Congress enacted the precursor to what is now 18 U.S.C. § 922(g)(3) as part of the Gun Control Act of 1968, seeking "broadly to keep firearms away from the persons [it] classified as potentially irresponsible and dangerous."[70]

102.     The provision prevents anyone "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act)" from possessing a firearm.[71]

103.     18 U.S.C. § 922(g)(3) has not gone without challenge, and the general consensus among courts has been that intermediate scrutiny applies to the analysis of a §922(g)(3) challenge.[72]

104.     The application of intermediate scrutiny to Section 922(g)(3) challenges, and in particular those involving the use of cannabis, is derived from prior courts applying the same test of scrutiny to a Section 922(g)(9) challenge.[73]

---

[69] Sophie Tatum, Veronica Stracqualursi, *Schumer to introduce bill to decriminalize marijuana* (Apr. 20, 2018).
https://www.cnn.com/2018/04/19/politics/schumer-marijuana/index.html.
[70] *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012); *see also Barrett v. United States*, 423 U.S. 212, 218, 96 S. Ct. 498, 502 (1976).
[71] 18 U.S.C. § 922(g)(3)
[72] *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012) ("Accordingly, as we did in *Chester*, we will apply intermediate scrutiny in evaluating Carter's claim. In reaching this conclusion, we join the other courts of appeals that have rejected the application of strict scrutiny in reviewing the enforcement of § 922(g)(3), or, for that matter, any other subsection of § 922(g)"); *see also Binderup v. AG of United States*, 836 F.3d 336, 398 (3d Cir. 2016) (Adopting the holding of *Carter* in applying intermediate scrutiny to §922(g) challenges and stating that, "[t]he decisions of several other circuits are in accord").

105.     18 U.S.C. § 922(g)(9) prohibits those "who ha[ve] been convicted in any court of a misdemeanor crime of domestic violence," from possessing a firearm.[74]

106.     Essentially equating cannabis use with domestic violence, courts have determined that in order for Section 922(g)(3) to pass constitutional muster, "the government still bears the burden of showing that § 922(g)(3)'s limited imposition on Second Amendment rights proportionately advances the *goal of preventing gun violence.*"[75]

107.     In *United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014), the court upheld the constitutionality of Section 922(g)(3) as "advanc[ing] the government's legitimate goal of preventing gun violence."[76]

108.     In its determination, the Court relied on purely correlational evidence and no evidence tending to prove that cannabis use was causally related to gun violence.[77]

---

[73] *Carter*, 669 F.3d at 417 (Adopting the analysis of *Chester*, and applying intermediate scrutiny to §922(g)(3) challenges); *see also United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (Applying intermediate scrutiny to §922(g)(9) challenges).

[74] 18 U.S.C. § 922(g)(9)

[75] *Carter*, 669 F.3d at 419 (with emphasis).

[76] *United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014).

[77] *Id.* at 467-69 ("We have little trouble concluding that the studies presented to the district court by both the government and Carter indicate a strong link between drug use and violence. A study by Carrie Oser and colleagues, offered by the government, found that probationers who had perpetrated violence in the past were significantly more likely to have used a host of drugs -- marijuana, hallucinogens, sedatives, and heroin -- than probationers who had never been involved in a violent episode. A 2004 survey of prisoners by the Bureau of Justice, again offered by the government, found that almost 50% of all state and federal prisoners who had committed violent felonies were drug abusers or addicts in the year before their arrest, as compared to only 2% of the general population. That survey also found that inmates who were dependent on drugs or abusing them were much more likely to have a criminal history. The government also presented a study by Lana Harrison and Joseph Gfroerer, which found that individuals who used marijuana or marijuana and cocaine, in addition to alcohol, were significantly more likely to engage in violent crime than individuals who only used alcohol. And finally, the government presented a study by Virginia McCoy and colleagues, which found that chronic cocaine and opiate users were more likely than nonusers to engage in robbery and violence...We have emphasized that, under intermediate scrutiny, the fit between the regulation and the harm need only be reasonable, not perfect...The correlational evidence put forward by the parties in the present case easily clears that bar").

109.     Other studies suggest that cannabis use is not causally related to gun violence, or violence in general, and that studies suggesting the contrary are purely correlative findings which fail to take into account certain key variables associated with cannabis's illegality.[78]

110.     A recent study conducted by Dr. Robert G. Morris, an Associate Professor of Criminology in the School of Economic, Political & Policy Sciences (EPPS) at the University of Texas at Dallas, yielded the following findings:

    a.   "Most researchers who have examined the relationship between marijuana use and crime report that these laws do not have an effect on violent crime."

    b.   "The raw number of homicides, robberies, and aggravated assaults also appear to be lower for states passing [Medical Marijuana Legalization] as compared to other states, especially from 1998–2006. These preliminary results suggest [Medical Marijuana Legalization] may have a crime-reducing effect."

    c.   "Research has also shown that marijuana use is not related to violent crime when measured at the individual-level *(citation omitted)*. Once drug charges are controlled for, Pedersen and Skardhamar *(citation omitted)* reported that the relationship between marijuana and crime was not significantly different from zero."

---

[78] Morris RG, TenEyck M, Barnes JC, Kovandzic TV, *The Effect of Medical Marijuana Laws on Crime: Evidence from State Panel Data, 1990-2006* (2014) ("These studies provide evidence to the notion that marijuana use is at a minimum correlated with an increase in violent or aggressive behaviors. What remains unclear is whether these findings imply a causal link between marijuana use and violence or whether the relationship is driven by an uncontrolled variable(s) (i.e., a spurious correlation). Along these lines, it could be argued that the relationship between violence and marijuana use is primarily due to its illegality and thus would not exist in an environment in which marijuana use, at least medicinally, is legalized"). https://doi.org/10.1371/journal.pone.0092816.

d.  "The central finding gleaned from the present study was that [Medical Marijuana Legalization] is not predictive of higher crime rates and may be related to reductions in rates of homicide and assault. Interestingly, robbery and burglary rates were unaffected by medicinal marijuana legislation, which runs counter to the claim that dispensaries and grow houses lead to an increase in victimization due to the opportunity structures linked to the amount of drugs and cash that are present."

e.  "In sum, these findings run counter to arguments suggesting the legalization of marijuana for medical purposes poses a danger to public health in terms of exposure to violent crime and property crimes. To be sure, medical marijuana laws were not found to have a crime exacerbating effect on any of the seven crime types. On the contrary, our findings indicated that MML precedes a reduction in homicide and assault. "[79]

111.    Once a medical marijuana law is implemented, spending on prescription drugs for which medical marijuana can serve as a clinical alternative falls significantly. One study has estimated that such savings in Part D Medicare expenditures equal or exceed $165,000,000 per year.[80]

---

[79] *Id.*
[80] Bradford, "Medical Marijuana Laws Reduce Prescription Medication Use In Medicare Part D," *Health Affairs* 35 No. 7 (2016), 1230-1236, doi: 10.1377/hlthaff.2015.1661.

112.     Medical marijuana exposes drug trafficking organizations and their affiliated gangs to legitimate competition, reducing their profits, decreasing violent crimes and reducing the consumption of illegal drugs such as cocaine.[81]

113.     State medical marijuana law also may be correlated with a reduction in homicide and assault rates.[82]

114.     Utilizing FBI records, a study has established that legalization of medical marijuana reduces robbery, larceny, and burglary.[83]

115.     State medical marijuana laws may be associated with decreased prescription opioid use, fewer prescription opioid-related hospitalizations, lower rates of opioid overdose, and reduced national health care expenditures related to prescription opioid overdose and misuse.[84]

116.     The results of the aforementioned studies, along with the racist and xenophobic history surrounding Cannabis's illegality, call into question the true governmental interest sought to be advanced by maintaining this policy.

**f.     Pennsylvania's Medical Marijuana Act**

117.     Pennsylvania's Medical Marijuana Act, 35 P.S. § 10231.101 *et seq.*, became effective on May 17, 2016.

---

[81] Gavrilova, et al., "Is Legal Pot Crippling Mexican Drug Trafficking Organizations? The Effect of Medical Marijuana Laws on US Crime," *The Economic Journal* (June, 2017), https://doi.org/10.1111/ecoj.12521.
[82] Morris, *et al.*, "The Effect of Medical Marijuana Laws on Crime: Evidence from State Panel Data, 1990-2006," PLoS ONE 9(3): e92816. doi:10.1371/journal.pone.0092816.
[83] Huber, *et al.*, "Cannabis Control and Crime: Medicinal Use, Depenalization and the War on Drugs," BE J. Econ. Anal. Policy 2016; 20150167, DOI 10.1515/bejeap-2015-0167.
[84] Vyas, *et al.*, "The Use of Cannabis in Response to the Opioid Crisis: A Review of the Literature," Nursing Outlook 66 (2018), 56-65, https://doi.org/10.1016/j.outlook.2017.08.012.

118.     Under the Medical Marijuana Act and Pennsylvania's Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-101 *et seq.*, use or possession of medical marijuana, in accordance with that Act, is lawful within the Commonwealth of Pennsylvania.  35 P.S. § 10231.303(a).  Use or possession of marijuana, in any form, is otherwise generally prohibited by Pennsylvania law.

119.     The Medical Marijuana Act strictly regulates the growth, processing, distribution and sale of medical marijuana within the Commonwealth of Pennsylvania.

120.     In order to lawfully possess and use medical marijuana, a Pennsylvania patient must first qualify with the Pennsylvania Department of Health; must then receive a recommendation to use medical marijuana from a physician who is also qualified by the Pennsylvania Department of Health to make such recommendations; and must obtain his or her medical marijuana from a distributor licensed and inspected by the Pennsylvania Department of Health, which in turn obtained the medical marijuana from a producer licensed and inspected by the Pennsylvania Department of Health.  Each of these transactions is recorded, in fine detail, in a database which is supervised by the Pennsylvania Department of Health.  Each of the entities involved in the process is subject to periodic inspection and licensing by the Pennsylvania Department of Health.

121.     Pennsylvania therefore has perhaps the strongest medical marijuana law in the nation.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SECOND AMENDMENT

122.     The foregoing paragraphs are incorporated herein by reference.

123.     Subsections (d)(3) and (g)(3) of 18 U.S.C. § 922, along with 27 C.F.R. § 478.11, ban federally licensed firearms dealers from selling firearms to any person who is

an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), and prevent such restricted class of people from purchasing the same.

124.     Defendants have implemented, and continue to enforce, maintain, and operate a policy whereby any person who has validly obtained a medical cannabis card pursuant to state law, and who has no other record of violence, criminal activity, or mental disorder, is prevented from exercising the basic, fundamental rights afforded to him or her under the Second Amendment.

125.     In fact, the ATF has explicitly warned federal firearms licensees that "[A]ny person who uses or is addicted to marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use for medicinal purposes, is an unlawful user of or addicted to a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition."   Arthur Herbert, *Open Letter to All Federal Firearms Licensees* (Sept. 21, 2011), available at  www.atf.gov/file/60211/download.

126.     By operation of the aforementioned statutes and regulations, any person who possesses a validly issued medical marijuana card, and who uses medical marijuana for the purposes of treating an approved illness enumerated under state law, is absolutely prevented from purchasing a firearm.  18 U.S.C. § 922(g)(3); 27 C.F.R. § 478.11.

127.     Similarly, by operation of the aforementioned statutes and regulations, any federally licensed firearms dealer, faced with a potential buyer who is also a medical marijuana patient, is absolutely prevented from selling a firearm to such buyer without committing a federal offense under 18 U.S.C. § 922(d)(3).

128.     As a result of 18 U.S.C. § 922(g)(3), (d)(3) and 27 C.F.R. § 478.11, and Defendants' enforcement of the same, the Plaintiff has been denied his Second Amendment right to obtain and possess a firearm, despite having no record of violence, criminal activity, or mental disorder.

129.     These laws have the specific purpose of infringing upon, and imposing an impermissible burden upon, the Plaintiff's right to keep and bear arms, as guaranteed by the Second Amendment.

130.     In the alternative, the foregoing presents an unconstitutional violation of the Second Amendment right to possess a firearm in one's home, for the purpose of self-defense, as it applies to this individual Plaintiff.

131.     As a direct and proximate result of the aforementioned laws and policies implemented, maintained, and enforced by the Defendants, the Plaintiff has and continues to suffer damages, and is precluded from exercising the rights afforded to him under the United States Constitution.

132.     The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present action, in addition to suffering injury in law and equity.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FIFTH AMENDMENT

133.     The foregoing paragraphs are incorporated herein by reference.

134.     Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922 ban federally licensed firearms dealers from selling firearms to any person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled

Substances Act (21 U.S.C. 802)," and prevent such restricted class of people from purchasing the same.

135.     By operation of the aforementioned statutes and regulations, any person who possesses a validly issued medical marijuana card, and who uses medical marijuana for the purposes of treating a statutorily enumerated illness, is absolutely prevented from purchasing a firearm without committing a federal offense under 18 U.S.C. § 922(g)(3).

136.     Similarly, by operation of the aforementioned statutes and regulations, any Federally licensed firearms dealer, faced with a potential buyer who is also a medical marijuana patient, is absolutely prevented from selling a firearm to such buyer without committing a federal offense under 18 U.S.C. § 922(d)(3).

137.     As a result of 18 U.S.C. § 922(g)(3), (d)(3) and 27 C.F.R. § 478.11, and Defendants' enforcement of the same, the Plaintiff is being treated differently than similarly situated individuals.

138.     Specifically, Plaintiff is being treated differently from similarly situated persons, with the same medical conditions as those of the Plaintiff, who choose to pursue different methods of treatment for those particular medical conditions.  Plaintiff lawfully purchased and used medical marijuana for the purposes of treating post-traumatic stress disorder.  Other individuals with post-traumatic stress disorder have obtained treatment through the use of Ambien.[85]  Ambien is known to have psychoactive and/or motor-function-inhibiting effects, which may have a greater impact on human motor function

---

[85] Nick Wing, Matt Ferner, *Veterans Can Get All Of These Prescription Drugs To Treat PTSD, But Not Weed* (Dec. 6, 2017).
https://www.huffingtonpost.com/2015/06/23/veterans-ptsd-marijuana_n_7506760.html.

than medical marijuana.[86]   Plaintiff, by operation of his choice of medical treatment, is unable to lawfully purchase a firearm from a federally licensed firearms dealer.  On the contrary, another individual, similarly situated, who uses Ambien to treat his or her illness, is not so precluded.  Therefore, Plaintiff is being treated differently than similarly situated persons, with the same medical conditions as those of the Plaintiff, who choose to pursue different methods of treatment for those particular medical conditions.

139.    Furthermore, Plaintiff is being treated differently than similarly situated persons, who have no history of violence, nor a criminal record, who partake in the occasional or recreational consumption of federally legal substances that, when ingested, inhibit human motor function and/or have psychoactive effects, such as alcohol.  The rules complained of in this action contain no specific prohibition, restriction, or limitation on the purchase or sale of a firearm to an individual who occasionally and/or recreationally consumes alcohol.   On the contrary, the rules specifically prohibit individuals who use marijuana for medical purposes from owning a firearm, by marijuana's classification as a Schedule I narcotic under the Controlled Substances Act. Therefore Plaintiff is being treated differently than similarly situated persons, who have

---

[86] Food and Drug Administration NDA 19908 S027: *Highlights of Prescribing Information, Ambien® (zolpidem tartrate) tablets* (Apr. 23, 2008) ("A variety of abnormal thinking and behavior changes have been reported to occur in association with the use of sedative/hypnotics. Some of these changes may be characterized by decreased inhibition (e.g., aggressiveness and extroversion that seemed out of character), similar to effects produced by alcohol and other CNS depressants. Visual and auditory hallucinations have been reported as well as behavioral changes such as bizarre behavior, agitation and depersonalization… Complex behaviors such as "sleep-driving" (i.e., driving while not fully awake after ingestion of a sedative-hypnotic, with amnesia for the event) have been reported with sedative-hypnotics, including zolpidem…[Side effects may include] agitation, anxiety, decreased cognition, detached, difficulty concentrating, dysarthria, emotional lability, hallucination, hypoesthesia, illusion…abnormal thinking, aggressive reaction, apathy, delusion, dementia, depersonalization, dysphasia, feeling strange, hypokinesia, hypotonia, hysteria, intoxicated feeling, manic reaction, neuralgia, neuritis, neuropathy, neurosis, panic attacks, paresis, personality disorder, somnambulism, suicide attempts, tetany, yawning"). https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/019908s027lbl.pdf.

no history of violence, nor a criminal record, who partake in the occasional or recreational consumption of federally legal substances that, when ingested, inhibit human motor function and/or have psychoactive effects, such as alcohol.

140.     Additionally, Plaintiff is being treated differently than similarly situated persons, who have no history of violence, nor a criminal record, who partake in the occasional or recreational consumption of federally unregulated substances that, when ingested, inhibit human motor function and/or have psychoactive effects, such as kratom, salvia divinorum, or various forms of synthetic cannabinoids.[87] The rules contain no specific prohibition, restriction, or limitation on the purchase or sale of a firearm to an individual who occasionally and/or recreationally consumes any or either of the aforementioned substances or with similar effects, which are also not regulated by the Federal Government.  On the contrary, the rules specifically prohibit individuals who use marijuana for medical purposes from owning a firearm, by marijuana's classification as a Schedule I narcotic under the Controlled Substances Act.  Therefore Plaintiff is being treated differently than similarly situated persons, who have no history of violence, nor a criminal record, who partake in the occasional or recreational consumption of federally unregulated substances that, when ingested, inhibit human motor function and/or have psychoactive effects, such as kratom, salvia divinorum, or various forms of synthetic cannabinoids.

---

[87] *Synthetic Cannabinoids (K2/Spice)*, National Institute on Drug Abuse (Revised February 2018), https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice (Synthetic cannabinoids act on the same brain cell receptors as THC (delta-9-tetrahydrocannabinol), the mind-altering ingredient in marijuana).

141.     These laws and policies violate the Plaintiff's right to equal protection under the laws of the United States, as guaranteed by the Equal Protection Clause of the Fifth Amendment.

142.     In the alternative, the foregoing presents an unconstitutional violation of the Fifth Amendment's right to equal protection under the law, as it applies to this individual Plaintiff.

143.     As a direct and proximate result of the aforementioned laws and policies implemented, maintained, and enforced by the Defendants, the Plaintiff has and continues to suffer damages, and is precluded from exercising the rights afforded to him under the United States Constitution.

144.     The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present action, in addition to suffering injury in law and equity.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE PROCEDURAL DUE PROCESS CLAUSE OF**
**THE FIFTH AMENDMENT**

145.     The foregoing paragraphs are incorporated herein by reference.

146.     Plaintiff possesses a protected liberty interest, namely, his right to possess a firearm in his home for the purpose of self-defense under the Second Amendment to the United States Constitution.

147.     Defendants have implemented, and continue to enforce, maintain, and operate a policy whereby any person who has validly obtained a medical cannabis card pursuant to state law, and who has no other record of violence, criminal activity, or mental disorder that would warrant such a preclusion, is prevented from exercising the basic rights afforded to him under the Second Amendment.

148.     Defendants have deprived the Plaintiff of his protected liberty interest by promulgation of their policy whereby any person who has validly obtained a medical cannabis card pursuant to state law, and who has no other record of violence, criminal activity, or mental disorder, is prevented from owning a firearm.

149.     The Defendants have denied the Plaintiff adequate procedural protections before depriving him of his right to purchase and possess a firearm.  Defendants did not provide him with any form of hearing to determine if the deprivation was justified under the law.[88]  Similarly, Defendants have provided no means by which the Plaintiff may reclaim his right.[89]

150.     In violation of the Plaintiff's right to procedural due process, Defendants have unilaterally and conclusively determined that individuals who use medical cannabis to treat their illnesses have a propensity for gun violence, by operation of their choice of medical treatment.

151.     The foregoing presents an unconstitutional violation of the Fifth Amendment's right to procedural due process, as it applies to this individual Plaintiff.

152.     As a direct and proximate result of the aforementioned laws and policies implemented, maintained, and enforced by the Defendants, the Plaintiff has and continues to suffer damages, and is precluded from exercising the rights afforded to him under the United States Constitution.

---

[88] The only potential administrative remedy for an individual prohibited from purchasing a firearm under 18 U.S.C. § 922(g)(3) is found in 18 U.S.C. § 925(c); however, this provision of the Act has not been funded since 1992, and in each year's appropriations bill, Congress specifically states that the ATF shall not utilize any appropriated dollars for federal firearms relief determinations.  *See* The Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 (declaring, "Provided, that none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under section 925(c) of title 18, United States Code").
[89] *Id.*

153.    The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present action, in addition to suffering injury in law and equity.

## FOURTH CAUSE OF ACTION
### VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

154.    The foregoing paragraphs are incorporated herein by reference.

155.    The Plaintiff's right to possess a firearm under the Second Amendment is deeply and objectively rooted in this nation's history and tradition, and implicit in the concept of ordered liberty, such that the deprivation of rights asserted herein amounts to an unconstitutional infringement of the Plaintiff's fundamental liberties. *McDonald v. City of Chicago,* 561 U.S. 742, 768 (2010) ("'citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense'...*Heller* makes it clear that this right is 'deeply rooted in this Nation's history and tradition'").

156.    The Plaintiff recognizes that the Second Amendment does not provide an absolute, unrestricted right to possess a firearm, and that reasonable restrictions, such as those imposed on felons or those adjudicated mentally ill, are valid; however, neither the Plaintiff, nor those similarly situated, pose the type of risk of gun violence associated with the reasonable restrictions named, simply due to their status as medical marijuana patients.

157.    The Plaintiff possesses the fundamental right to possess a firearm in his home under the Second Amendment, as determined by the Supreme Court of the United States in the seminal case of *District of Columbia v. Heller*, 554 U.S. 570 (2008).

158.    As a result of 18 U.S.C. § 922(g)(3), (d)(3) and 27 C.F.R. § 478.11, and Defendants' enforcement of the same, the Defendants are advancing an interpretation of

the law which automatically assumes that medical marijuana patients, by operation of the method of treatment of their illnesses, are prone to engage in gun violence in the same manner as those adjudicated mentally ill or those who have been convicted of a felony.[90]

159.      As a result of the aforementioned legal interpretation and policy advanced by Defendants, the Plaintiff and those similarly situated are prohibited from purchasing a firearm without violating federal Law, and therefore the Defendants have deprived Plaintiff of his substantive due process right.

160.      Additionally, the Plaintiff possesses the fundamental right to be free from self-incrimination, as guaranteed by the Fifth Amendment, and as affirmed by the seminal case of *In re Gault*, 387 U.S. 1, 47-48 (1967).[91]

161.      In order to purchase a firearm from a federally licensed firearms dealer, a citizen must complete and submit ATF Form 4473.

162.      Question 11(e) on ATF Form 4473 asks, "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside."

---

[90] "Most researchers who have examined the relationship between marijuana use and crime report that these laws do not have an effect on violent crime… Results revealed no evidence that marijuana use was related to an increase in later non-drug arrest, such as arrests for violent crimes. The authors argued that the association between marijuana use and crime appears to exist because of its illegality. Thus, if the possession and sale of marijuana was legal the relationship between marijuana and crime might disappear." Robert G. Morris, Michael TenEyck, J. C. Barnes, Tomislav V. Kovandzic, *The Effect of Medical Marijuana Laws on Crime: Evidence from State Panel Data, 1990-2006*, PLoS ONE 9(3): e92816. doi:10.1371/journal.pone.0092816, *available at* http://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0092816&type=printable.

[91] "The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory . . . it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used." *In re Gault*, 387 U.S. 1, 47-48 (1967).

163.    If a medical marijuana patient wishes to purchase a gun, he or she must respond to the Question 11(e) either in the affirmative or the negative.  If the patient answers in the negative, then he or she has committed an offense punishable by federal law.  If the patient answers in the affirmative, not only will he or she be denied the right to purchase a firearm, but he or she also opens him/herself to criminal prosecution by way of admitting to being an "unlawful user of, or addicted to, marijuana."

164.    The federal laws, legal interpretations, and policies implemented, enforced, and otherwise perpetuated by Defendants require that anyone who wishes to purchase a firearm, respond to Question 11(e) honestly, or face federal prosecution.

165.    Here, the Plaintiff completed ATF Form 4473, and honestly answered Question 11(e) in the affirmative, due to his status as a medical marijuana patient, and due to his use of medical marijuana for medicinal purposes.  Therefore, by answering Question 11(e) in the affirmative, Plaintiff has effectively been forced to incriminate himself as an "unlawful user of, or addicted to, marijuana," despite being a legal medical marijuana patient under Pennsylvania law.

166.    By operation of the legal scheme implemented, enforced, or otherwise perpetuated by Defendants, and by operation of the legal requirement forcing legal medical marijuana patients to answer Question 11(e) on ATF Form 4473 in the affirmative, the Defendants have forced the Plaintiff to incriminate himself, and have effectively deprived him of his right to substantive due process.

167.    In the alternative, the foregoing presents an unconstitutional violation of the Fifth Amendment's right to substantive due process, as it applies to this individual Plaintiff.

168.    As a direct and proximate result of the aforementioned laws and policies implemented, maintained, and enforced by the Defendants, the Plaintiff has suffered and continues to suffer damages, and is precluded from exercising the rights afforded to him under the United States Constitution.

169.    The Plaintiff has incurred attorney's fees and costs as a direct result of prosecuting the present action, in addition to suffering injury in law and equity.

**FIFTH CAUSE OF ACTION**
**RELIEF FROM PROHIBITION UNDER 18 U.S.C. §1925(c)**

170.    The foregoing paragraphs are incorporated herein by reference.

171.    The provisions of 18 U.S.C. § 1925(c) provide that a person may apply to the attorney general for relief from the prohibition of Section 922(g)(3) if the person can meet two criteria:   First, that "the applicant will not be likely to act in a manner dangerous to public safety."   Second, that "the granting of the relief would not be contrary to the public interest."

172.    Plaintiff is not likely to act in a manner dangerous to public safety.

173.    Permitting Plaintiff to purchase and possess a firearm is not contrary to the public interest.

**SIXTH CAUSE OF ACTION**
**RELIEF FROM PROHIBITION UNDER 18 U.S.C. § 922**
**BY REASON OF THE PENNSYLVANIA MEDICAL MARIJUANA ACT**

174.    The foregoing paragraphs are incorporated herein by reference.

175.    Because of the provisions of the Pennsylvania Medical Marijuana Act, Plaintiff is not "an unlawful user of or addicted to any controlled substance," and therefore is not prohibited from purchasing and possessing a firearm under 18 U.S.C. § 922(g)(3).

176.     The prohibition of 18 U.S.C. § 922 applies to a person who is an "unlawful user of or addicted to any controlled substance." 18 USC § 922(g)(3).

177.     "Unlawful user of or addicted to any controlled substance" is defined as a person who regularly ingests controlled substances in a manner **except as prescribed by a physician**. *United States v. Yancey*, 621 F.3d 681, 682 (7th Cir. 2010) (citing 27 C.F.R. § 478.11); *United States v. Burchard*, 580 F.3d 341, 352 (6th Cir.2009); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir.2005) (emphasis added).

178.     In Pennsylvania, "prescription" is defined as:

   a.   "an order for a controlled substance, other drug or device for medication which is dispensed to or for an ultimate user, but does not include an order for a controlled substance, other drug or device for medication which is dispensed for immediate administration to the ultimate user..." 35 P.S. § 780-102; and/or

   b.   "A written or oral order for a drug or device to be dispensed to or for an ultimate user." 49 Pa. Code § 18.122.

179.     Federal law adopts state law definitions of "prescription." *See* 21 U.S.C. § 353 (emphasis added): "A drug intended for use by man which...is not safe for use except under the supervision of a practitioner licensed by law to administer such drug...shall be dispensed only (i) upon **a written prescription of a practitioner licensed by law to administer such drug**, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist...

180.     Under Pennsylvania's Medical Marijuana Act, "A certification to use medical marijuana may be issued by a practitioner to a patient if all of the following

requirements are met... [including] [t]he certification is made on a "standard certification form." 35 P.S. § 10231.403(a); 35 P.S. § 10231.404.

181.    Thus, medical marijuana in Pennsylvania is recommended by a "practitioner licensed by law to administer" it, through "an order for a controlled substance" on a written form.

182.    Consequently, a medical marijuana patient is not an unlawful user of a controlled substance.  Hence the prohibition of 18 U.S.C. § 922 does not apply to a Pennsylvania medical marijuana patient, such as Plaintiff.

183.    Because 18 U.S.C. § 922 is both a criminal statute and an infringement on a constitutional right, it must be strictly construed.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the court enter judgment in his favor and against Defendants as follows:

1. Declare that Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922, 27 C.F.R. § 478.11, ATF Form 4473 Question 11(e), and the legal interpretations and policies implemented, enforced, or otherwise perpetuated by Defendants, violate the right to keep and bear arms as guaranteed under the Second Amendment to the United States Constitution.

2. Declare that Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922, 27 C.F.R. § 478.11, ATF Form 4473 Question 11(e), and the legal interpretations and policies implemented, enforced, or otherwise perpetuated by Defendants, violate the right to procedural due process as guaranteed under the Fifth Amendment to the United States Constitution.

3. Declare that Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922, 27 C.F.R. § 478.11, ATF Form 4473 Question 11(e), and the legal interpretations and policies implemented,

enforced, or otherwise perpetuated by Defendants, violate the right to substantive due process as guaranteed under the Fifth Amendment to the United States Constitution.

4. Declare that Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922, 27 C.F.R. § 478.11, ATF Form 4473 Question 11(e), and the legal interpretations and policies implemented, enforced, or otherwise perpetuated by Defendants, violate the right to equal protection under the law as guaranteed under the Fifth Amendment to the United States Constitution.

5. Declare that Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922, 27 C.F.R. § 478.11, ATF Form 4473 Question 11(e), and the legal interpretations and policies implemented, enforced, or otherwise perpetuated by Defendants, violate the right to be free from self-incrimination, as guaranteed under the Fifth Amendment to the United States Constitution.

6.   Declare that the statutes, regulations and forms set forth in the preceding paragraph do not bar Plaintiff, individually, from purchasing and possessing a firearm.

7. Permanently enjoin Defendants, their officers, agents, servants, employees, and all others acting in participation with them from enforcing or otherwise perpetuating Subsections (g)(3) and (d)(3) of 18 U.S.C. § 922, 27 C.F.R. § 478.11, ATF Form 4473 Question 11(e), and the legal interpretations and policies implemented, enforced, or otherwise perpetuated by Defendants, and to provide such other injunctive relief as the Court deems necessary, in order to advance the interests of justice and protect the rights afforded under the United States Constitution.

8. Award the Plaintiff compensatory damages, as the Court deems necessary, in order to advance the interests of justice and protect the rights afforded under the United States Constitution.

9. Award costs, attorney's fees and expenses to the extent permitted under 28 U.S.C. §§ 2412, 1920 and 18 U.S.C. § 925(a).

10. Award such other and further relief as the Court deems just and proper.


Respectfully Submitted

**SACKS WESTON DIAMOND, LLC**

By: _____
John K. Weston, Esq.
Identification No. 26314
jweston@sackslaw.com
Andrew B. Sacks, Esq.
Identification No. 41390
asacks@sackslaw.com
Brian P. Drach, Esq.
Identification No. 324749
bdrach@sackswestondiamond.com
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103
Phone: (215) 925-8200
*Attorneys for Plaintiff*

Joshua Prince, Esq.
Identification No. 306521
Firearms Industry Consulting Group
A Division of Civil Rights Defense Firm P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297
joshua@civilrightsdefensefirm.com
*Attorney for Plaintiff*